**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

LARRY TOWNS, JR.,

        Plaintiff,

                                   Case No. 3:15-cv-140-J-34JBT

vs.

RICK BESELER, in his official capacity
As Sheriff of Clay County, Florida, et al.,

        Defendants.

_____/

# O R D E R

    **THIS CAUSE** is before the Court on Defendant, Rick Beseler's, Motion for Summary Judgment with Supporting Memorandum of Law (Doc. 41; Beseler Motion), Defendant, Deputy M.J. Pesek's Motion for Summary Judgment with Supporting Memorandum of Law (Doc. 42; Pesek Motion), and Tomlinson's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 48; Tomlinson Motion), all filed on December 11, 2015.  After requesting and receiving several extensions of time, Plaintiff Larry Towns, Jr. (Towns) filed responses to these Motions on June 24, 2016.  See Plaintiff's Response to Defendant Beseler's Motion for Summary Judgment (Doc. 75; Response to Beseler); Plaintiff's Response to Defendant Pesek's Motion for Summary Judgment (Doc. 74; Response to Pesek); Plaintiff's Response to Defendant Tomlinson's Motion for Summary Judgment (Doc. 73; Response to Tomlinson).[1]  Accordingly, this matter is ripe for review.

_____

[1] All told, Plaintiff's counsel requested additional time to respond to the Motions no less than five times, see Docs. 53, 55, 56, 59, 63, and the Court twice extended the deadlines sua sponte when counsel missed a deadline without filing anything, see Docs. 58, 72.  Counsel's first three request for extensions of time were premised on the winter holidays, work conflicts, and a death in the family.  See Docs. 53, 55, 56.  When counsel missed the extended deadline of February 1, 2016, the Court sua sponte granted Towns an

## I.      Background[2]

Plaintiff Larry Towns, Jr. (Towns) brings this action, pursuant to 42 U.S.C. § 1983,

against Defendants James A. Tomlinson and Michael Joseph Pesek, as individuals, and

Defendant Rick Beseler, in his official capacity as Sheriff of Clay County, Florida (the

Sheriff).  See Amended Complaint (Doc. 11) at 1.  Towns asserts claims against Tomlinson

---

extension to February 19, 2016.  After that deadline had expired, on February 22, 2016, counsel requested another extension of time due to "his extended illness as well as the passing of two (2) immediate family members."  See Plaintiff's Fourth Motion for Extension of Time to File Response to Motions for Summary Judgment (Doc. 59).  The Court granted an extension to March 4, 2016, see Endorsed Order (Doc. 60), but on March 17, 2016, when counsel had failed to file anything with the Court, the Magistrate Judge issued an Order to Show Cause (Doc. 62) why the case should not be dismissed for failure to prosecute.  Counsel responded to the Order to Show Cause by seeking another extension of time due to his illness and the resulting backlog of his cases.  See Plaintiff's Response to Order to Show Cause and Motion for Extension (Doc. 63).  The Magistrate Judge set the matter for a hearing, during which he cautioned that counsel may have an obligation to withdraw if his physical or mental condition materially impairs his ability to represent Towns.  See Order (Doc. 68).  Nonetheless, counsel elected to remain in this case, and following the hearing, after reviewing counsel's medical records, Judge Toomey granted counsel up to May 20, 2016, to respond to the Motions.  See Order (Doc. 71).  Although the May 20, 2016 deadline came and went with no word from counsel, the undersigned sua sponte extended the deadline, one final time, to June 24, 2016.  See Order (Doc. 72).  At last, on that date, counsel managed to submit the Responses.

Although the Court is sympathetic to counsel's health problems, it is unclear why the other members of counsel's law firm were not available to assist with the representation of the law firm's client.  More significantly, the Court notes that counsel's illness did not prevent him from timely fulfilling his responsibilities to a different client by filing a response on January 25, 2016, and a reply on March 10, 2016, in a lawsuit pending before the Florida Supreme Court.  See generally Norman v. Florida, SC15-650 (Fla. 2015).  Indeed, despite missing the May 20, 2016 deadline in this case without explanation, counsel was able to appear for oral argument on behalf of that client on June 8, 2016.  See WFSU, Florida Supreme Court Oral Arguments: Dale Norman v. State, SC15-650, The Florida Channel (June 8, 2016), http://thefloridachannel.org/videos/6816-florida-supreme-court-oral-arguments-dale-norman-v-state-sc15-650/.  As such, while the Court does not discount counsel's health problems, it appears that at least some of the missed deadlines and lengthy delays in this case were caused not by illness, but by a lack of attention given to this case.  Nonetheless, because the Court prefers to decide cases on the merits, and seeks to avoid penalizing Towns for his counsel's delays, the Court has endeavored to obtain responses despite the missed deadlines.  The Court cautions counsel, however, that the record of delay in this case is highly unusual, and will not be permitted should counsel appear before this Court in the future.

Finally, it bears noting that, despite receiving over six months to respond to the Motions for Summary Judgment, the three Responses, altogether, cite to exactly four cases and two exhibits, one of which, as discussed below, is misidentified.  Counsel makes no attempt to tailor his legal arguments to the specifics of each Defendant's role in the purported false arrest, and exhibits only a lackluster effort in meeting the difficult burdens of overcoming qualified immunity and establishing municipal liability.  Having elected to proceed with his representation of Towns, despite his health difficulties, counsel had an obligation to his client to do better.

[2] As discussed below, because this case is before the Court on Defendants' Motions for summary judgment, the facts recited herein and all reasonable inferences therefrom have been viewed in a light most favorable to Towns.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

and Pesek for false arrest in violation of his Fourth and Fourteenth Amendment rights. Id. at 4-7. In addition, Towns alleges that the Sheriff is liable for his wrongful arrest because the Sheriff failed to properly train and supervise the officers, and operated the Clay County Sheriff's Office (CCSO) under a policy of "arrest now ask questions later" in "blatant disregard of constitutional requirements . . . ." Id. at 8-10. Pursuant to Rule 56, Federal Rules of Civil Procedure (Rule(s)), Tomlinson, Pesek, and the Sheriff move for summary judgment in their favor on all claims. The undisputed circumstances which led to Towns' mistaken arrest are as follows.

On April 16, 2011, Tomlinson, a deputy sheriff for Clay County, Florida, responded to a shoplifting call at a Sears located in the Orange Park Mall. See Affidavit of James A. Tomlinson (Doc. 49-1; Tomlinson Aff.) ¶¶ 2-3. Upon arrival, Tomlinson met with Jesse Alcantara, the Loss Prevention Officer at Sears, who showed him a surveillance video of the incident. Id. ¶ 3. On the video, Tomlinson observed a black male (the Shoplifter) concealing four bottles of cologne and exiting the store without paying. See id. ¶ 3; see also Plaintiff's Notice of Filing Exhibit (Doc. 76; Surveillance Video). Alcantara had detained the Shoplifter, and was holding him in the Loss Prevention Office when Tomlinson arrived. See Tomlinson Aff. ¶ 3. Alcantara provided Tomlinson with the Shoplifter's purported Florida Identification card (Florida ID). Id. ¶ 4. The name on the Florida ID was Larry Towns, Jr., described as a black male with a date of birth in 1981.[3] Id. According to Tomlinson, "[t]he photograph on the Florida Identification card appeared to be the same person [he] had in [his] custody." Id. Tomlinson then escorted the Shoplifter to his vehicle

---

[3] It is undisputed that this 1981 date of birth is Towns' actual birthday. In accordance with Rule 5.2, the Court includes only the year of Towns' birth in this Order. See Rule 5.2(a)(2). Any mention of the 1981 birthdate in this Order refers to that same date.

to "check for warrants and verify if he was eligible for a notice to appear in lieu of being arrested." Id. At that time, Tomlinson "verified the [Shoplifter's] address, phone number and social security number." Id.[4] Tomlinson's search revealed no outstanding warrants for Larry Towns, Jr., and Tomlinson determined that Towns qualified for a notice to appear. Id. As such, Tomlinson issued a Notice to Appear and released the Shoplifter. Id., Ex. A (Doc. 49-1; Notice to Appear). The Notice to Appear names Larry Towns, Jr., and describes him as a black male, with a 1981 birthdate, who is 5'9" tall and weighs 160 pounds, with black hair, brown eyes, and a fair complexion. See Notice to Appear. The Notice to Appear also indicates that Towns has a tattoo of a lion on his right forearm. Id. As noted, "[t]he biographical information in the notice to appear auto-populated." Id.[5] It is undisputed that the actual Larry Towns, Jr., the Plaintiff in this case, is not the Shoplifter. See Tomlinson Aff. ¶ 6. Rather, at some point after November 13, 2013, Tomlinson learned that the Shoplifter was actually Bernard Calvin Hicks. Id. According to Tomlinson, Hicks and Towns "resembled each other very closely." Id. Unsurprisingly, Hicks did not show up on the Notice to Appear issued in the name of Larry Towns, Jr. As a result, on May 13, 2011, the Honorable Richard R. Townsend issued an arrest warrant for the arrest of "Larry

---

[4] Tomlinson does not explain how he "verified" this information or what he means by that statement. Notably, Tomlinson states that the "biographical information" in the Notice to Appear "auto-populated." See Tomlinson Aff. ¶ 4. Thus, it is unclear whether he "verified" this data by asking the Shoplifter if it was correct, to confirm the accuracy of his records, or whether he "verified" the information by asking the Shoplifter to provide these details independently and cross-checking it with the database to confirm that the Shoplifter was who he said he was. Because the Court views the evidence in the light most favorable to Towns, the Court will construe this statement to mean that Tomlinson verified the accuracy of the data, not the identification.

[5] Although unclear, it appears the "auto-populated" information was derived from a CCSO Field Interview Report dated December 23, 2001, regarding a Larry Towns, Jr. with the same 1981 birthday. See Field Interview Report (Doc. 51-2). The Field Interview Report also describes Larry Towns, Jr. as a 5'9", 160-pound black male with black hair, brown eyes, a light complexion and a "lion" tattoo on his right arm. Id.

Towns" for his failure to appear in court and answer the pending charge of shoplifting.  See Affidavit of Deputy M.J. Pesek (Doc. 51-1; Pesek Aff.) ¶ 5, Ex. A: Warrant.

Towns lost his Florida ID some time prior to the shoplifting incident.  See Towns Dep. at 6-8.  He first learned that someone was misusing his identity when he received a letter from an attorney for Sears.  See id. at 8.  Towns contacted the law firm and was told that he was accused of shoplifting.  Id. at 8.  When Towns explained that someone had stolen his identity he was instructed to send the law firm a copy of his identification and an identity theft report.  Id. at 9-11.  Pursuant to these instructions, on August 15, 2011, Towns filed an incident report with the Jacksonville Sheriff's Office (JSO) regarding the fraudulent use of his personal identification information.  See Amended Complaint (Doc. 11), Ex. B: Incident Report.  The Incident Report includes a statement from Towns that he lost his Florida ID in November of 2010, and an unknown person "committed the crime of theft at Sears (Clay County) and the suspect(s) was let go." Id. at 2.  Towns sent this information to Sears and believed the matter was resolved.  See Towns Dep. at 10-12.

In September of 2013, Pesek, a CCSO law enforcement officer, was assigned to the Warrants Division.  See Pesek Aff. ¶ 4.  In this role, it was Pesek's duty to "attempt to locate and serve suspects with outstanding arrest warrants."  Id.  Because the Towns Warrant pertained to a low level misdemeanor, prior to attempting to execute the Warrant, Pesek sent a letter to Towns requesting that he "present to the jail regarding the active arrest warrant."  Id. ¶ 6.  Towns learned of the Warrant when it arrived in the mail from Pesek.  See Towns Dep. at 12.  Upon receiving the Warrant, he called the CCSO and spoke with Pesek.  Id. at 12-14.  Pesek told Towns about the shoplifting charge and the missed court date, and explained to Towns that it would be best if he came to the CCSO.

5

Id. at 15.  Towns maintains that he told Pesek that he had filed an identity theft report with the JSO.  Id. at 16.  Towns' mother, Rosetta Andrena Hayes, called Pesek to find out what the Warrant was about and he told her to bring Towns to the CCSO.  See Deposition of Rosetta Andrena Hayes (Doc. 40-4; Hayes Dep.) at 28.  Hayes and Towns' father, Larry Towns, Sr. (Senior) then went to the CCSO, without Towns, and informed Pesek that he had the wrong person.  See Deposition of Larry Towns, Sr. (Doc. 40-2; Senior Dep.) at 10-13.  Nonetheless, their efforts were fruitless and Pesek told them to bring Towns back within a week.  Id. at 13.

On September 9, 2013, Towns turned himself in on the Warrant.  See Pesek Aff. ¶ 7.  The Warrant describes Larry Towns as a black male, 5'9" tall, weighing 160 pounds, with brown eyes and black hair.  See Pesek Aff., Ex. A.  Towns is a black male, with black hair and brown eyes.  See Pesek Aff., Ex. B: Arrest Report.  According to Pesek, he verified that Towns was the person named on the Warrant by "confirming his name, date of birth, social security number, driver's license number, height, weight, eye color, and hair color."  Id. ¶ 8.[6]  Pesek completed the booking process and prepared an Arrest Report.  Id. ¶ 10; Arrest Report.  Towns' parents visited a bail bondsman and Hayes paid $150 to obtain a bond for Towns.  See Senior Dep. at 16; Hayes Dep. at 23-24.  According to Towns, he

---

[6]  The height on the Warrant is 5'9", while Towns' height as reflected on the Adult Arrest Report that Pesek prepared is 5'7".  See Pesek Aff., Exs. A-B.  According to Towns, he is 5'6 to 5'7", but concedes that on past identification cards his height was recorded as 5'8" or 5'9".  See Towns Dep. at 35.  Towns states that his current Florida ID lists his height as 5'7".  Id. at 81.  In addition, the Warrant describes his weight as 160 pounds, while the Arrest Report puts Pesek's weight at 142 pounds.  According to Towns, when measured at the time of his arrest, he weighed 115 pounds, and has not weighed more than 130 or 140 pounds in "some years."  See Towns Dep. at 35, 79-80.  Nonetheless, Towns does concede that he has weighed as much as 160 or 170, and guessed that his Florida ID would list his weight at 150 or 160.  Id. at 79-80.  Towns acknowledges that the name, address, and birth date on the Warrant were accurate, but denies that his social security number was included on the Warrant.  See id. at 71-72.  Because the copy of the Warrant filed with the Court is redacted, it is unclear what social security number, if any, is on the document.  See Pesek Aff., Ex. A.

was held for a "couple of hours" and then released on bond the same day.  See Towns

Dep. at 28-29.  Towns later went to court on the matter, but before the case proceeded to

trial, the State Attorney's Office dropped the charges.  See Towns Dep. at 30.

## II.    Standard of Review

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Rule 56(a).  The record to be considered on a motion for summary

judgment may include "depositions, documents, electronically stored information, affidavits

or declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials."  Rule 56(c)(1)(A).[7]  An issue is

genuine when the evidence is such that a reasonable jury could return a verdict in favor of

the nonmovant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)

(quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A]

mere scintilla of evidence in support of the non-moving party's position is insufficient to

defeat a motion for summary judgment."  Kesinger ex rel. Estate of Kesinger v. Herrington,

381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to

the court, by reference to the record, that there are no genuine issues of material fact to be

---

[7] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged.  The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law.  The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

determined at trial.  See Clark, 929 F.2d at 608.  "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.   Individual Liability

### A.  Qualified Immunity and False Arrest

"[S]ection 1983 provides individuals with a federal remedy for the deprivation of rights, privileges, or immunities protected by the Constitution or the laws of the United States that are committed under color of state law."  Brown v. City of Huntsville, Ala., 608 F.3d 724, 733 n.12 (11th Cir. 2010) (citation omitted); see 42 U.S.C. § 1983.  Thus, to state a claim for relief under § 1983, a plaintiff must sufficiently allege that he or she was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law."  See Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1276-77 (11th Cir. 2003) (quotation omitted).   Here, Towns asserts that Defendants violated his Fourth and Fourteenth

Amendment rights.[8]   Specifically, Towns alleges that Defendants deprived him of his "liberty interest."  See Amended Complaint at ¶¶ 39, 55, 77.

"Qualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  As a result, the qualified immunity defense protects from suit "'all but the plainly incompetent or those who knowingly violate the law.'"[9]  Carr v. Tatangelo, 338 F.3d 1259, 1266 (11th Cir. 2003).  Indeed, as "'government officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful."  Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting Marsh v. Butler County, Ala., 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).

In order to be entitled to qualified immunity, an official must first establish that his conduct was within the scope of his discretionary authority.  See Webster v. Beary, 228 F. App'x 844, 848 (11th Cir. 2007) (per curiam); Lee, 284 F.3d at 1194.  In the instant action, Tomlinson and Pesek were plainly acting within their discretionary authority at the time Tomlinson issued the Notice to Appear and later when Pesek arrested Towns.[10]

---

[8] The Fourth Amendment applies to state and local governments pursuant to the Due Process Clause of the Fourteenth Amendment.  See Brown, 608 F.3d at 734 n.15.

[9] In determining whether a defendant is entitled to qualified immunity, the court views the facts and all reasonable inferences in the light most favorable to the plaintiff to the extent supported by the record and then considers "the legal issue of whether the plaintiff's 'facts,' if proven, show that the defendant violated clearly established law."  Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 925 n.3 (11th Cir. 2000); Scott v. Harris, 550 U.S. 372, 381 n.8 (2007).

[10] "'A government official acts within [his] discretionary authority if the actions were (1) undertaken pursuant to the performance of his duties and (2) within the scope of his authority.'" Jones v. City of Atlanta, 192 F.

Accordingly, the burden shifts to Towns to demonstrate that qualified immunity is not appropriate using the two-prong test established by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 201 (2001).  The first inquiry is, taken in the light most favorable to the non-moving party, "do the facts alleged show the officer's conduct violated a constitutional right?"  Id.; see also Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (quoting Scott v. Harris, 550 U.S. 372, 377 (2007)).   If the court finds that a violation of a constitutional right has been alleged based on the plaintiff's version of the facts, then the next question is whether the right was clearly established at the time of the violation.[11] Saucier, 533 U.S. at 201; Scott, 550 U.S. at 377; Lee, 284 F.3d at 1194.  The court must undertake this second inquiry "in light of the specific context of the case, not as a broad general proposition."  Saucier, 533 U.S. at 201.  Indeed, the Supreme Court recently reiterated the stringent requirements for satisfying this inquiry, explaining that "[t]he relevant inquiry is whether existing precedent placed the conclusion that [the officer] acted unreasonably in these circumstances 'beyond debate.'"  See Mullenix v. Luna, ___ U.S. ___, 136 S. Ct. 305, 309 (2015); see also D.H. ex rel. Dawson v. Clayton Cnty. Sch. Dist., 830 F.3d 1306, 1319 (11th Cir. 2016).

"The Fourth Amendment . . . guarantees the right against unreasonable searches and seizures."  Brown, 608 F.3d at 734 n.15 (emphasis added).  "An arrest without probable cause violates the Fourth Amendment."  Id.  Under both federal and Florida law,

> [f]or probable cause to exist, . . . an arrest must be objectively reasonable based on the totality of the circumstances.  This standard is met when the

---

App'x 894, 897 (11th Cir. 2006) (per curiam).  Making an arrest is thus a discretionary function for a police officer.  See Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004).

[11] In Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808 (2009), the Supreme Court modified the procedure mandated in Saucier permitting trial judges the discretion to determine which prong of the qualified immunity analysis should be resolved first.  See Pearson, 129 S.Ct. at 818.

> facts and circumstances within the officer's knowledge, of which he or she
> has reasonably trustworthy information, would cause a prudent person to
> believe, under the circumstances shown, that the suspect has committed, is
> committing, or is about to commit an offense.

Lee, 284 F.3d at 1195 (quotation and internal quotation marks and citation omitted).

However, "[t]o receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause."  Brown, 608 F.3d at 734.  As such, the dispositive question for qualified immunity purposes in this action is whether Tomlinson and Pesek had at least arguable probable cause to arrest Towns.  Id.[12]  "Arguable probable cause exists 'where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] could have believed that probable cause existed to arrest.'"

---

[12] In wrongful arrest cases, the "clearly established" prong of qualified immunity is framed as an "arguable probable cause" inquiry.  See Poulakis v. Rogers, 341 F. App'x 523, 526 (11th Cir. 2009); Case v. Eslinger, 555 F.3d 1317, 1327-28 (11th Cir. 2009) ("Absent evidence that a constitutional violation occurred, we need not consider whether the alleged violation was clearly established; that is, we need not consider whether [the officer] lacked even arguable probable cause."); see also Scarbrough v. Myles, 245 F.3d 1299, 1303 (11th Cir. 2001) (per curiam).  In other words, "when an officer violates the Constitution because he lacked probable cause to make an arrest, the officer's conduct may still be insulated under the second prong of qualified immunity if he had 'arguable probable cause' to make the arrest."  Poulakis, 341 F. App'x at 526.  The Eleventh Circuit explains that

> [a]n examination of arguable probable cause makes sense under the second prong because the second prong does not ask whether the Constitution was violated.  Instead, it asks only whether a reasonable officer was given fair and sufficient notice that what he was doing was unlawful under the circumstances.  Simply put, the only question we ask under [the] second prong is whether "[a] reasonable officer[ ] in the same circumstances and possessing the same knowledge as the Defendant[ ] could have believed that probable cause existed to arrest."

Id. at 527 n.2 (quoting Lee, 284 F.3d at 1195); see also Moran v. Cameron, 362 F. App'x 88, 93 (11th Cir. 2010) (addressing the second prong of the Saucier test by asking whether the officer's arrest of the plaintiff "was clearly established as unconstitutional because it lacked arguable probable cause"); Eloy v. Guillot, 289 F. App'x 339, 343 n.5 (11th Cir. 2008) ("The arguable probable cause standard applies in the 'clearly established law' prong of the qualified immunity analysis."); but see Poulakis, 341 F. App'x at 534-35 (Quist, J., dissenting) (citing Skop v. City of Atlanta, Ga., 485 F.3d 1130 (11th Cir. 2007)); Hawthorne v. Sheriff of Broward Cnty., 212 F. App'x 943, 946-47 (11th Cir. 2007) (holding that because the officer had arguable probable cause for the arrest, the plaintiff failed to show a constitutional violation and the court need not consider the "clearly established" prong of the qualified immunity analysis); Davis v. Williams, 451 F.3d 759, 764 n.8 (11th Cir. 2006) (characterizing the "arguable probable cause" inquiry as addressing the first step of the qualified immunity analysis because "there is no question that the second step-clearly established-is satisfied, as it is clearly established that an arrest made without probable cause violates the Fourth Amendment").

Lee, 284 F.3d at 1195 (quotation omitted); see also Brown, 608 F.3d at 734. "This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who unreasonably conclude that probable cause exists." Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1137 (11th Cir. 2007).

### B. Tomlinson

Tomlinson argues that he did not violate Towns' constitutional rights because he had probable cause to arrest the Shoplifter, and his misidentification of the Shoplifter as Towns was a reasonable mistake. See Tomlinson Motion at 9. Regardless, Tomlinson maintains that he is entitled to qualified immunity because he had at least arguable probable cause to name Towns in the Notice to Appear and did not violate any clearly established law governing such circumstances. Id. at 10-11. Towns responds that summary judgment is inappropriate because there are issues of fact regarding whether Tomlinson conducted a reasonable investigation in identifying the Shoplifter and whether Tomlinson's misidentification of the Shoplifter as Towns was a reasonable mistake. See Response to Tomlinson at 2-3. Towns argues that Tomlinson knew the Notice to Appear could result in the issuance of an arrest warrant and failed to act as a reasonably well-trained officer in verifying the identity of the Shoplifter. See Response to Tomlinson at 6-8. According to Towns, Tomlinson's failure to properly identify the Shoplifter constitutes a "complete disregard for his duty and indifference to" Towns' rights. Id. at 7. Towns asserts that there is "no evidence of the similarity of [the Shoplifter and Towns] other than [Tomlinson's] own testimony," and maintains that it is a jury question whether Tomlinson's reliance on the Florida ID was reasonable. Id. at 8-9.

In considering whether Tomlinson may be held liable for the alleged false arrest, the Court first observes that Tomlinson did not actually arrest Towns, and Towns' eventual arrest was executed pursuant to an Arrest Warrant issued by a state court judge. Nonetheless, because Tomlinson does not appear to dispute that his Notice to Appear ultimately caused the arrest, the Court finds Tomlinson's conduct analogous to a request for a warrant and will therefore analyze his actions within the framework set forth in Malley v. Briggs, 475 U.S. 335 (1986).  See Rich v. Dollar, 841 F.2d 1558, 1565-66 (11th Cir. 1988) (explaining that Malley established a form of the objective reasonableness test that is applicable to "claims of qualified immunity advanced by defendant police officers '. . . whose request for a warrant allegedly caused an unconstitutional arrest'" (citation omitted)).  In Malley, the Supreme Court instructed that an officer who causes an unlawful arrest by applying for an arrest warrant without probable cause can be held liable for a constitutional violation, even if a magistrate judge approved the warrant.  See Malley, 475 U.S. at 345-46; see also Carter v. Gore, 557 F. App'x 904, 908 (11th Cir. 2014).  The Supreme Court explained that in such circumstances, "the officer's application for a warrant was not objectively reasonable, because it created the unnecessary danger of an unlawful arrest."  See Malley, 475 U.S. at 345.  Likewise, here, if Tomlinson unreasonably issued the Notice to Appear in the wrong name, he created the unnecessary danger of an unlawful arrest.  For purposes of qualified immunity, the Eleventh Circuit describes the Malley standard as follows:

> a police officer who caused the alleged unconstitutional arrest of the person bringing a § 1983 action against him is not entitled to qualified immunity if ". . . a reasonably well-trained officer in the [defendant officer's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the [arrest] warrant."

See Rich, 841 F.2d at 1566 n.6 (quoting Malley, 475 U.S. at 345).  Notably, even under this standard, "the question is not whether probable cause actually existed; rather, the question is whether the officer had 'arguable' probable cause."  See Carter, 557 F. App'x at 908.  Moreover, "[i]ncases [sic] of mistaken identity, where an officer erroneously swears an affidavit for the wrong party, qualified immunity will apply if the mistake was 'reasonable.'"  See Thornton v. City of Tampa, No. 8:09-cv-00041-JDW-EAJ, 2010 WL 427737, at *3 (M.D. Fla. Feb. 3, 2010) (citing Tillman v. Coley, 886 F.2d 317, 320 (11th Cir. 1989)).

Prior to issuing the Notice to Appear, Tomlinson watched the Sears surveillance video showing a black male concealing four bottles of cologne and exiting the store without paying.  See Tomlinson Aff. ¶ 3.  The individual shown on the video was located in the Loss Prevention Office when Tomlinson arrived at the Sears, and Alcantara, the Loss Prevention Officer, provided Tomlinson with what was purported to be that individual's Florida ID.  See id. ¶¶ 3-4.  Tomlinson's unrebutted testimony is that "[t]he photograph on the Florida Identification card appeared to be the same person [he] had in [his] custody."  See id. ¶ 4.  In accordance with the name on the Florida ID, Tomlinson then issued the Notice to Appear for Larry Towns, Jr.  Id.  Based on the principles of qualified immunity set forth above, the question before the Court is "whether reasonable law enforcement officials 'in the same circumstances and possessing the same knowledge as [Tomlinson] could have believed that probable cause existed to arrest.'"  See Rushing v. Parker, 599 F.3d 1263, 1266 (11th Cir. 2010) (per curiam) (quoting Case, 555 F.3d at 1327)).  Plainly, in light of the Surveillance Video and Alcantara's statements, Tomlinson had probable cause to arrest the Shoplifter.  Thus, the Court next considers whether the misidentification of the

Shoplifter as Larry Towns, Jr. was a reasonable mistake.  See Tillman v. Coley, 886 F.2d 317, 320 (11th Cir. 1989) ("An officer mistakenly arresting a second party when the arrest of the first party would be valid may be protected by qualified immunity only if the mistake in arresting the second party is 'reasonable.'").  Tomlinson had reasonably trustworthy information, namely a valid Florida ID, from which to conclude that an individual by the name of Larry Towns, Jr. had committed the offense.  Moreover, it is undisputed that Towns had not yet reported the fraudulent use of his identification to law enforcement, and Tomlinson was otherwise unaware that Towns' identity had been stolen.  See Tomlinson Aff. ¶ 4.  As such, Tomlinson's mistake appears to be a reasonable one.  Cf. Thornton, 2010 WL 427737, at *4 (denying qualified immunity for misidentification where "[n]o one has argued that [plaintiff] bears a resemblance to the man in the video or that his picture could reasonably be mistaken for that of the man who sold crack cocaine to [the defendant officer]").

Nonetheless, Towns contends that it is a jury question whether Tomlinson reasonably relied on the Florida ID, and asserts that Tomlinson offers "no evidence of the similarity of [Towns and the Shoplifter] other than his own testimony."  See Response to Tomlinson at 8-9.  However, it is Towns' burden to produce evidence from which a jury could conclude that Tomlinson's actions were "objectively unreasonable: that is, under the facts and circumstances known to the officer at the time, his actions violated clearly established law."  See Bates v. Harvey, 518 F.3d 1233, 1242 (11th Cir. 2008).  Faced with Tomlinson's sworn statements that the Florida ID card appeared to depict the Shoplifter, and that the Shoplifter and Towns resembled each other, Towns must submit evidence from which a reasonable jury could conclude that Tomlinson's actions were unreasonable.

Towns fails to carry that burden.  Indeed, the only evidence Towns submits of the Shoplifter's appearance is the Surveillance Video.  <u>See</u> Plaintiff's Notice of Filing Exhibit (Doc. 76).  Towns argues that "[t]he person in the video bears no resemblance to Plaintiff." <u>See</u> Response to Tomlinson at 4.  However, the Surveillance Video is grainy and the Shoplifter's face is obscured by a hat.  As such, the Court finds it impossible to ascertain whether the Shoplifter bears any facial resemblance to Towns.[13]  Thus, there is simply no evidence to suggest that Tomlinson's decision to issue the Notice to Appear in the name of Larry Towns, Jr. was anything but a reasonable mistake.

In addition, Towns contends that Tomlinson acted unreasonably in failing to take sufficient steps to ensure that he did not misidentify the Shoplifter.[14]  However, unlike the

---

[13]  Notably, after the events of this lawsuit, Tomlinson learned that the Shoplifter's true identity was Bernard Calvin Hicks, and now maintains that "Mr. Hicks and the actual Larry Towns, Jr. resembled each other very closely."  <u>See</u> Tomlinson Aff. ¶ 6.  Towns fails to submit any clear evidence of Hicks' appearance with which to question Tomlinson's opinion, despite the fact that Hicks appears to be incarcerated such that his height, weight, age, and photograph would be readily available.  <u>See</u> Deputy Tomlinson's Consented Motion to Depose Prisoner (Doc. 38), filed August 27, 2015.  The Shoplifter does appear in the Surveillance Video to be a larger man than Towns, but Towns concedes that his Florida ID may have listed his height as 5'8" or 5'9" and his weight as 150 or 160 pounds.  <u>See</u> Towns Dep. at 35, 80.  Tomlinson was unaware that the actual Larry Towns, Jr. was of a smaller stature, and while the Shoplifter looks taller and heavier than even 5'9" and 160 pounds, no juror could conclude based on this slight deviation that it was objectively unreasonable for Tomlinson to accept that the Florida ID belonged to the Shoplifter.  <u>Cf.</u> Chapman v. City of Atlanta, Ga., 192 F. App'x 922, 924 (11th Cir. 2006) ("[G]iven the totality of the circumstances, [plaintiff's] arrest was reasonable even in the face of an obvious racial discrepancy."); <u>Rodriguez v. Farrell</u>, 280 F.3d 1341, 1347-48 & nn.14-15 (11th Cir. 2002) ("[I]n the context of this case, a mistaken [height] estimate of no more than five inches does not equal a constitutional violation.").  Indeed, if Tomlinson's actions do not constitute a reasonable mistake, and expose him to potential liability, then future officers will likely feel compelled to take all suspects into custody, no matter how minor the offense, solely for the purpose of verifying their identity through fingerprints: "the risk of error in identification, and then a lawsuit, would simply be too great."  <u>See id.</u> at 1348 n.16 (reasoning that if liability is imposed for mistakenly arresting someone pursuant to a warrant where only a height discrepancy indicated the misidentification, then officers would be deterred too much from making public arrests on valid warrants for fear of a lawsuit).

[14]  Towns also argues that Tomlinson acted in "complete disregard for his duty" and with "deliberate indifference" to Towns' rights.  <u>See</u> Response to Tomlinson at 7.  Aside from the lack of any evidence to support his characterization of Tomlinson's conduct, this argument is inapposite as the arguable probable cause analysis is an objective one.  <u>See</u> Rushing, 599 F.3d at 1266 ("'The essence of qualified immunity analysis [as to arguable probable cause] is the public official's objective reasonableness, regardless of his underlying intent or motivation.'  'The standard is an objective one, and therefore does not include an inquiry in the officers' subjective intent or beliefs.'" (citations omitted)).

cases on which Towns relies, Tomlinson had no indication that the Shoplifter was not who he purported to be.  Cf. Tillman, 886 F.2d at 320 (finding no qualified immunity where officer was aware of an age discrepancy between the subject and the plaintiff, had doubts about the plaintiff's identity, and ample time to investigate); Cannon v. Macon Cnty., 1 F.3d 1558, 1563-65 (11th Cir. 1993) (denying qualified immunity where officer was on notice plaintiff may not be the perpetrator because plaintiff informed officer of mistaken identity and the fugitive report did not accurately describe the plaintiff) modified, 15 F.3d 1022 (11th Cir. 1994); see Rushing, 599 F.3d at 1267 (distinguishing Rodriguez and Cannon because the officers in those cases "had some indication that they may be arresting the wrong person"). Paraphrasing Tillman, Towns argues that "[d]ue process does require that steps be taken to avoid mis-identity mistakes."  See Response to Tomlinson at 6 (citing Tillman, 886 F.2d at 321).   However, what Tillman actually instructs is that: "due process does require that some steps be taken to eliminate doubts concerning identity that exist prior to obtaining the warrant and to arrest."  See Tillman, 886 F.2d at 321 (emphasis added).  Here, Towns offers no evidence that Tomlinson had any reason to doubt the validity of the Florida ID, or that a reasonable officer in Tomlinson's position would have questioned the validity of the Florida ID.  As such, the Court finds no basis on which a juror could conclude that Tomlinson acted unreasonably.[15]   Rather, Tomlinson's "conduct here is the type that

---

[15] To the extent Towns maintains that Tomlinson otherwise conducted an insufficient investigation, this argument is unavailing.  See Response to Tomlinson at 5.  Although, "[a]n arresting officer is required to conduct a reasonable investigation to establish probable cause," Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998), the Fourth Amendment does not require Tomlinson to perform an error-free investigation, nor does it obligate Tomlinson to explore and eliminate every plausible theory of innocence before arresting an offender.  See Kingsland v. City of Miami, 382 F.3d 1220, 1229 n.10 (11th Cir. 2004).  While it would have been unreasonable if Tomlinson had ignored exculpatory information offered to him, conducted his investigation in a biased fashion, or elected not to obtain easily discoverable facts, see id. at 1229, Towns presents no evidence that Tomlinson operated in this manner.  Rather, Towns maintains that Tomlinson somehow should have realized that the Shoplifter's identification was false, and taken steps to verify the Shoplifter's identity through his fingerprints.  See Response to Tomlinson at 5.  Yet Towns cites to no authority

qualified immunity is meant to protect: 'a reasonable mistake in the legitimate performance of [an officer's] duties.'"  See Rushing, 599 F.3d at 1267 (quoting Kingsland, 382 F.3d at 1233)).  Thus, the Court concludes that Tomlinson had probable cause, or at a minimum, arguable probable cause, to issue a Notice to Appear in the name of Larry Towns, Jr., and as such, the Tomlinson Motion is due to be granted.

## C. Pesek

It is undisputed that Pesek arrested Towns pursuant to a valid warrant with Towns' correct name, birthday, and address.  See Towns Dep. at 70-71; see also Amended Complaint ¶ 51.  Nonetheless, Towns maintains that, under the circumstances of this case, Pesek should have investigated the "accuracy of the information on the warrant" prior to arresting Towns since both Towns and his parents informed Pesek that Towns was the victim of identity theft.  Although Towns acknowledges the "general rule that an arrest pursuant to a valid warrant cannot form the basis for a deprivation of liberty claim," he asks the Court to "create . . . an exception here . . . that when an individual is turning themselves in pursuant to a warrant and readily available information would tell the arresting officer that he has the wrong individual, the officer has an obligation to act."  See Response to Pesek at 3.[16]  Aside from being factually wrong about the existence of a fingerprint, Towns'

_____

establishing that Tomlinson had a clearly established affirmative obligation to seek out additional information of which he was not aware.  See Kelly v. Curtis, 21 F.3d 1544, 1551-52 (11th Cir. 1994) (finding officers protected by qualified immunity where officers "had neither actual knowledge of the [exculpatory evidence] nor a clearly established duty to ferret it out").  With the benefit of hindsight, it is easy to identify steps Tomlinson could have taken that would have prevented this unforeseen error, but his investigation of the shoplifting incident was by no means "plainly incompetent," nor a knowing violation of the law.  See Rushing, 599 F.3d at 1268.

[16] Towns makes much of a thumbprint on a notice to appear which, according to Towns, Pesek could have easily utilized to determine that Towns was not in fact the Shoplifter.  See Response to Pesek at 3-4.  However, the document to which Towns refers is a notice to appear dated April 13, 2011, for shoplifting in Duval County, and signed by an officer whose identification number is 68482.  See Plaintiff's Notice of Filing Exhibit (Doc. 73-1).  The shoplifting incident at issue here occurred on April 16, 2011, in Clay County.  See Amended Complaint, Ex. A.  The Notice to Appear that Tomlinson issued is attached as Exhibit A to the

argument also evidences a fundamental misunderstanding of qualified immunity.  Even if the Court were inclined to create such an exception, Pesek is entitled to qualified immunity unless Towns can point to authority demonstrating that when Pesek acted the law was developed "'in such a concrete and factually defined context to make it obvious to all reasonable government actors'" in Pesek's place that arresting Towns on a valid warrant without investigating his claims of innocence would violate federal law.  See Pickens v. Hollowell, 59 F.3d 1203, 1206 (11th Cir. 1995) (citation omitted).  Indeed, Towns must point to existing precedent which "place[s] the conclusion that [Pesek] acted unreasonably in these circumstances 'beyond debate.'"  See Mullenix, 136 S. Ct. at 309.  Towns cites to no authority in the Eleventh Circuit or otherwise clearly establishing that when Pesek executed the valid arrest warrant, which unambiguously identified Towns, Pesek had an obligation to investigate Towns' claims of mistaken identity prior to the arrest.

Indeed, the Eleventh Circuit's decision in Pickens addresses substantially similar circumstances and finds that no clearly established obligation exists.  In that case, the plaintiff, Buelah Pickens, was visiting her son in jail when a routine criminal record check revealed outstanding warrants for her arrest on bad check charges.  See Pickens, 59 F.3d at 1204.  Although Pickens informed the officers that her checks had been stolen from her car and that she had filed forgery charges on the matter, she was nevertheless placed under arrest and "held in the jail for several hours before being released on a cash bond."  Id. at 1205.  Eventually, the charges against Pickens were dismissed.  Id.  Among other

---

Tomlinson Affidavit and is signed by Tomlinson with an officer identification number of 06654.  See Tomlinson Aff., Ex. A (Doc. 49-1).  This Notice to Appear does not have a thumbprint on it.  See id.  Thus, the Court rejects Towns' suggestion that Pesek had access to a thumbprint with which he could verify the identity of the Shoplifter.  Towns also refers to Pesek's failure to verify the "accuracy of the information on the warrant for tattoos," see Response to Pesek at 4, but the Warrant makes no mention of the presence, absence, or appearance of any tattoos.  See Arrest Warrant.

things, Pickens argued that "notwithstanding the otherwise valid warrants, the deputies lacked probable cause to arrest once she told them that she had reported that the checks had been stolen from her car and forged." Id. at 1208.  Relying on the Supreme Court's decision in Baker v. McCollan, 443 U.S. 137, 145-46 (1979), the Pickens Court instructed that an officer executing a valid arrest warrant is not "'required by the Constitution to investigate independently every claim of innocence.'"  See Pickens, 59 F.3d at 1208 (quoting Baker, 443 U.S. at 145-46).  Because Pickens' contention that her checks were stolen was a claim of innocence, and the law was not clearly established that the officers were required to investigate and determine whether she was guilty or innocent before they executed the arrest warrants, the Court found that the officers were entitled to qualified immunity.  Id.  Likewise, Towns' contention that his identity was stolen was a claim of innocence, and Towns cites no clearly established law requiring Pesek to investigate and determine whether Towns was guilty or innocent before he executed the valid arrest warrant.  As such, Pesek is entitled to qualified immunity for his arrest of Towns.[17]  Id.; see

---

[17] To the extent Towns contends that his detention constitutes a deprivation of liberty without due process of law, this argument is also unavailing.  "Obviously, one in [Towns'] position could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment."  See Baker, 443 U.S. at 144.  Nonetheless, "a valid warrant does justify arrest and detention for some period of days."  See Chapman, 192 F. App'x at 924.  Moreover, "the official charged with maintaining custody of the accused named in the warrant" is not required "by the Constitution to perform an error-free investigation of such a claim."  Baker, 443 U.S. at 146.  Rather, "[t]he ultimate determination of such claims of innocence is placed in the hands of the judge and the jury."  Id.  Because Towns was arrested and held pursuant to a valid arrest warrant and because he was released from custody after only a few hours, he "was not entitled to more process to review [his] claims of innocence in the face of the mistaken arrest."  See Chapman, 192 F. App'x at 925.  Although Towns argues that "his liberty interest were [sic] still restricted while he was out on bond as conditions of bond limited his freedom," see Response to Tomlinson at 7 n.13, he presents no evidence of such conditions, and fails to cite any case law to suggest that while on bond he was entitled to any greater process than he received.  The Court will not do counsel's work for him, and this claim therefore fails without any evidence or legal authority to support it.  Moreover, the Amended Complaint is focused solely on the decision to arrest Towns and contains no reference to a deprivation of liberty due to the bond conditions.  See generally Amended Complaint.  It is well-established in the Eleventh Circuit that a plaintiff cannot amend his complaint through argument at the summary judgment stage of the proceedings.  See Menzie v. Ann Taylor Retail, Inc., 549 F. App'x 891, 896 (11th Cir. 2013) (per curiam).

also Chapman, 192 F. App'x at 924-25; Carter v. City of Lake Mary, No. 605CV1137ORL31DAB, 2005 WL 3019390, at *4 (M.D. Fla. Nov. 10, 2005) ("[Plaintiff's] false arrest claim against [the officer] boils down to the allegation that [plaintiff] provided [the officer] with exculpatory information to which [the officer] failed to give credence, and which [the officer] failed to investigate, thereby causing [plaintiff] to be arrested pursuant to a presumptively valid warrant.  These allegations are not sufficient to state a cause of action against [the officer] for a Fourth Amendment violation." (internal citation omitted)).

## IV.    Municipal Liability - The Sheriff[18]

To the extent Tomlinson and Pesek had probable cause to arrest Towns, there is no constitutional violation for which the Sheriff could be held responsible.  See Windham v. City of Fairhope, 597 F. App'x 1068, 1073 (11th Cir. 2015) (per curiam); Best v. Cobb Cnty., Ga., 239 F. App'x 501, 504 (11th Cir. 2007) (per curiam) ("[P]laintiffs' 'failure to train' claim could not exist independent of an underlying constitutional violation.").  However, even if Towns has shown a constitutional violation, his municipal liability claim fails.  A county or municipality may be liable in a § 1983 action "only where the municipality itself causes the constitutional violation at issue."  Cook ex. rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115 (11th Cir. 2005) (citations omitted).  Thus, a plaintiff must establish that an official policy or custom of the municipality was the "moving

---

[18] Where an officer is sued under 42 U.S.C. § 1983 in his official capacity, the suit is actually a proceeding against the entity the officer represents.  See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115 (11th Cir. 2005); see also Hafer v. Melo, 502 U.S. 21, 25 (1991) ("[O]fficial-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting Kentucky v. Graham, 473 U.S. 159, 165 (1985))).  Accordingly, Towns' claim against Beseler in his official capacity as Sheriff of Clay County is actually a claim against Clay County.  Thus, the Court considers the Sheriff's liability in the context of those cases discussing county and municipal liability under § 1983.

force" behind the alleged constitutional deprivation.  See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 693-94 (1978).

Here, Towns' theory is that the Sheriff is liable because he failed to implement appropriate policies or procedures to prevent the wrongful arrest of individuals due to mistaken identities.  See Response to Sheriff at 4-5.  "The failure to establish a policy or procedure for adequately training officers may constitute a 'policy' giving rise to § 1983 liability, even in cases where the supervising official was not personally involved."  See Rocker v. City of Ocala, Fla., 355 F. App'x 312, 314 (11th Cir. 2009) (per curiam).  However, even if the Sheriff lacked such a policy, to impose liability, Towns must show that "this lack of a policy demonstrated a deliberate indifference to [Towns'] Fourth Amendment rights."  Id.  To do so, Towns must "present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action."  Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998).  The Eleventh Circuit has repeatedly held that "without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train or supervise."  Id. at 1351.  Indeed, "the need for such training must be plainly obvious to [County] decisionmakers," such as where there is "evidence of a history of widespread prior abuse."  Wright v. Sheppard, 919 F.2d 665, 674 (11th Cir. 1990) (alteration added); see also Rocker, 355 F. App'x at 314.[19]

---

[19] The Court notes that the Supreme Court, in dictum, has left open the possibility that "a need to train could be 'so obvious,'" that a city could be held liable even without a pattern of prior constitutional violations.  See Gold, 151 F.3d at 1352 (citing City of Canton, 489 U.S. at 390); see also Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1293 (11th Cir. 2009) ("Alternatively, deliberate indifference may be proven without evidence of prior incidents, if the likelihood for constitutional violations is so high that the need for training would be obvious.").  The Supreme Court offered the example of the need to train officers in the use of deadly force where the officers are provided firearms.  City of Canton, Ohio v. Harris, 489 U.S. 378, 390 n.10 (1989).  Towns does not assert this argument, nor do the facts of this case fit into the "narrow range of circumstances" where a violation of federal rights may be a highly predictable consequence of the failure to train government

In this case, the Sheriff offers the Affidavit of Sergeant Brian Welch (Doc. 44-1; Welch Aff.), a sergeant in the Public Integrity Section of the CCSO, with specific knowledge about the policies and procedures of the CCSO.  See Welch Aff. ¶ 2.  Welch avers that the CCSO was not on notice of any prior, allegedly wrongful arrests of individuals that resulted from not attaching a photograph or fingerprint of a suspect to a notice to appear, after the suspect misidentified himself with stolen identification." Id. ¶ 8.  In addition, he states that the CCSO "was not on notice of any prior, alleged constitutional violations that resulted in a pattern, or a persistent and widespread practice of allegedly wrongful arrests based on similar circumstances." Id.  Welch also describes the certification and training that deputies employed by the CCSO must undergo, id. ¶¶ 3-4, and identifies several CCSO policies pertaining to arrests and investigations, id. ¶ 5.  In response, Towns does not offer any evidence demonstrating the existence of a pattern of abuse sufficient to establish that the Sheriff had notice of a need to train or supervise his law enforcement officers in this particular area.  Indeed, Towns does not provide evidence of even one instance of a prior constitutional violation or false arrest by an employee of the CCSO, much less a violation in connection with a mistaken identity arrest.  Although the Amended Complaint contains allegations that other incidents of mistaken identity arrests have occurred, and Towns includes argument about those incidents in his Response to the Sheriff, at this summary judgment stage of the proceedings, Towns fails to support those allegations with any evidence.  See Jeffery, 64 F.3d at 593-94 ("When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits,

---

employees. See Gold, 151 F.3d at 1352 (quoting Bd. Cnty Comm'rs v. Brown, 520 U.S. 397, 409 (1997)); see also Lewis, 561 F.3d at 1293 (finding that the need for training concerning the application of the hobble restraining device does not rise to a sufficient level of obviousness).

or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." (internal quotation marks omitted)).

In the absence of any evidence of a pattern of related constitutional violations, Towns has not shown that the Sheriff had notice of a need to train. See Rocker, 355 F. App'x at 314; cf. Rivas v. Freeman, 940 F.2d 1491, 1495-96 (11th Cir. 1991) (finding sheriff subject to liability for failing to train his officers regarding reliable identification techniques where plaintiff presented evidence establishing that the sheriff "knew of prior instances of mistaken identity, but allowed his deputies to detain individuals even where discrepancies existed"). As such, Towns fails to demonstrate a genuine issue of material fact with respect to whether the Sheriff was deliberately indifferent to the rights of Clay County's inhabitants. In the absence of deliberate indifference, the alleged failure to train the officers cannot constitute a Clay County custom or policy and thus, Beseler, in his official capacity as Sheriff of Clay County, cannot be held liable for the alleged constitutional violations. See Rocker, 355 F. App'x at 314. Accordingly, the Sheriff's Motion is due to be granted. In light of the foregoing, it is

**ORDERED**:

1. Defendant, Rick Beseler's, Motion for Summary Judgment with Supporting Memorandum of Law (Doc. 41) is **GRANTED**.

2. Defendant, Deputy M.J. Pesek's Motion for Summary Judgment with Supporting Memorandum of Law (Doc. 42) is **GRANTED**.

3. Tomlinson's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 48) is **GRANTED**.

4.  The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendants Rick Beseler, in his official capacity as Sheriff of Clay County, Florida, Deputy J.A. Tomlinson, and Deputy M.J. Pesek, and against Plaintiff Larry Towns, Jr.

5.  The Clerk of the Court is further directed to terminate any remaining pending motions and deadlines, and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, this 12th day of October, 2016.

MARCIA MORALES HOWARD
United States District Judge

lc11
Copies to:

Counsel of Record
Pro Se Parties